UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

IZELLA MARIE JOHNSON,

                Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

DECISION & ORDER

13-CV-6510P

## PRELIMINARY STATEMENT

Plaintiff Izella Marie Johnson ("Johnson") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 17).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 10, 13). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Johnson's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.   Procedural Background

Johnson protectively filed for SSI and DIB on October 12, 2010, alleging disability beginning on August 1, 2006, due to low back pain and a right ankle injury.  (Tr. 162, 166).[1]  On December 30, 2010, the Social Security Administration denied Johnson's claims for benefits, finding that she was not disabled.  (Tr. 70-71).  Johnson requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ").  (Tr. 83-92, 100-05).  The ALJ conducted a hearing on January 24, 2012 in Rochester, New York.  (Tr. 35-69).  Johnson was represented at the hearing by her attorney Jaya Shurtliff, Esq.  (Tr. 35, 94-96).  In a decision dated March 16, 2012, the ALJ found that Johnson was disabled beginning on December 19, 2011, but was not disabled or entitled to benefits prior to that date.  (Tr. 19-30).

On July 26, 2013, the Appeals Council denied Johnson's request for review of the ALJ's decision.  (Tr. 1-6).  Johnson commenced this action on September 19, 2013 seeking review of the Commissioner's decision.  (Docket # 1).

## II.   Relevant Medical Evidence[2]

### A.   Treatment Records

#### 1.   Strong Memorial Hospital

On April 11, 2005, Johnson was treated in the Emergency Department at Strong Memorial Hospital ("Strong") for complaints of left-side chest pain.  (Tr. 334-67).  According to the treatment notes, Johnson indicated that she had been experiencing chest pain and dizziness

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

on and off for approximately one month.  (*Id.*).  Johnson denied any shortness of breath and indicated that the pain usually occurred when she was stressed or upset or after strenuous activity.  (*Id.*).  Gwy Seo, MD, conducted a bedside examination and assessed a mild cardiac silhouette enlargement.  (Tr. 331).  The records also indicate that Johnson received a blood transfusion due to heavy menstruation and anemia.  (Tr. 334-67).

On February 23, 2007, Johnson returned to Strong's Emergency Department after slipping on ice and falling on her left side.  (Tr. 368-409).  She also complained of heavy menstruation.  (*Id.*).  Johnson was again assessed to be anemic and received a blood transfusion.  (*Id.*).  She complained of left flank and neck pain and was prescribed iron, Flexeril, Vicodin and Motrin.  (*Id.*).  Images were taken of Johnson's abdomen, pelvis, head, chest, left hip, left humerus and thoracic spine.  (Tr. 313-30).

On July 21, 2011, Johnson returned to the Emergency Department complaining of back pain.  (Tr. 411-53).  She denied any recent injury, but reported suffering from chronic back pain.  (*Id.*).  According to Johnson, she had been experiencing back pain since she was thirty and was not certain whether an injury or accident had precipitated it.  (*Id.*).  She also reported that she previously had surgery on her ankle to remove a benign tumor.  (*Id.*).  Johnson indicated that she had been denied Medicaid, did not have a primary care physician, and treated her pain with Aleve and Tylenol.  (*Id.*).

Johnson denied weakness, numbness or paresthesias in her extremities.  (*Id.*).  Upon examination, she appeared moderately uncomfortable and demonstrated back pain with tenderness and spasm, but no deformity, myalgias, joint swelling or gait problems.  (*Id.*).  Images were taken of Johnson's lumbar spine, which demonstrated that her sacroiliac joints were symmetrical, her vertebral alignment was normal, and there were no acute fractures.  (*Id.*).  The

images did demonstrate two calcified bodies projecting over the upper pelvis.  (*Id.*).  The

radiologist assessed no acute bone or joint abnormalities of the lumbar spine.  (*Id.*).  Johnson was

given Percocet and Ativan for her pain.  (*Id.*).  Again, she was assessed to be anemic likely due

to a myomatous uterus and was given a transfusion.  (*Id.*).  Johnson was prescribed iron, Colace

and Naproxen.  (*Id.*).

## 2.   **Westside Health Services**

Treatment records indicate that Johnson began treating with Assaf Yosha

("Yosha"), MD, at Westside Health Services on December 21, 2011.  (Tr. 455-57).  During that

appointment, Johnson reported that she had not previously had a primary care physician due to

her uninsured status and received treatment through emergency room visits.  (*Id.*).  She

complained of chronic low back pain, which she reported had started in the early-2000's.  (*Id.*).

Johnson also reported that she had fallen off a motorcycle during the 1970's.  (*Id.*).  According to

Johnson, she used to experience only intermittent pain due to exacerbations, but her pain was

now worsening and constant.  (*Id.*).  She reported that she sometimes used a cane to ambulate,

but it was unclear to Yosha whether this was due to back pain or right heel pain.  (*Id.*).  Johnson

reported that she treated her pain with Aleve or Advil and had made an appointment with Unity

Spine Center for February 2012.  (*Id.*).  Johnson indicated that the pain was in her lower back

and sometimes radiated to her legs, with occasional left leg paresthesia.  (*Id.*).

Johnson also complained of menorrhagia and anemia, explaining that she

experienced unusually heavy menstrual cycles and that she had received approximately four

blood transfusions.  (*Id.*).  Johnson reported that her anemia caused her to be fatigued and dizzy

and that that she was routinely prescribed iron, but was unable to afford it.  (*Id.*).  She indicated

that previous imaging had demonstrated that she had fibroids.  (*Id.*).

Upon examination, Yosha noted a spasm along the lower thoracic and perilumbar regions with no spinal tenderness.  (*Id.*).  According to Yosha, Johnson demonstrated an antalgic gait because she did not bear weight on her right heel.  (*Id.*).  Johnson was unable to perform the heel or toe walk due to give-away.  (*Id.*).  According to Yosha, Johnson's range of motion in her spine was limited due to pain.  (*Id.*).

Yosha reviewed images of Johnson's spine, abdomen and pelvis that had been taken in 2007, as well as an additional image of her abdomen taken in July 2011.  (*Id.*).  Yosha assessed anemia, low back pain and suggested that Johnson be screened for diabetes.  (*Id.*).  Yosha prescribed Ferrous Sulfate and determined to monitor the fibroids, but noted that a hysterectomy might be necessary.  (*Id.*).  Yosha prescribed Mobic and Flexeril for her low back pain.  (*Id.*).

Johnson returned for an appointment with Yosha on January 11, 2012, complaining of continued back pain.  (Tr. 460-61).  She reported that she had received a blood transfusion in the Emergency Department in late December 2011.  (*Id.*).  According to Johnson, she continued to be fatigued and had experienced one episode of chest pain the prior week, but generally had better energy.  (*Id.*).  She reported that the Flexeril and Mobic were improving her back pain.  (*Id.*).  She also reported that she had been evaluated by a gynecologist, who had performed an endometrial biopsy.  (*Id.*).  Johnson indicated that the procedure would have to be repeated and that an ultrasound would be performed to assess her fibroids.  (*Id.*).

### 3.   Unity Spine Center

On February 1, 2012, Johnson attended an appointment with Joanne Wu ("Wu"), MD, at the Unity Spine Center.  (Tr. 463-66).  Johnson reported that she had experienced chronic back pain since a motorcycle accident in the 1970's and that she had an application for disability

benefits pending.  (*Id.*).  Johnson explained that she had been unemployed since 1979 due to her

back pain.  (*Id.*).  Johnson reported that she had primarily received care through emergency room

visits due to lack of insurance.  (*Id.*).  According to Johnson, her pain is a constant, dull, aching

pain, but without saddle anesthesia, limb weakness or numbness.  (*Id.*).  Johnson reported that

she walked with a cane and that standing, walking and sitting exacerbated her pain, while lying

down alleviated her pain.  (*Id.*).

       Upon examination, Wu noted no kyphosis or scoliosis, but observed tenderness in

Johnson's spine and a diffuse muscle spasm that was greater on the right side.  (*Id.*).  Wu also

noted excessive lumbar lordosis, flexion limited to 75% of normal limits and poor extension.

(*Id.*).  According to Wu, the straight leg raise was negative from a seated position.  (*Id.*).  Wu

also noted diminished range of motion in the right ankle with diffuse allodynia.  (*Id.*).

       Wu assessed a chronic antalgic gait due to a previous right ankle injury that was

complicating Johnson's chronic low back pain.  (*Id.*).  Wu referred Johnson to physical therapy

and recommended that Yosha refer her to an orthopedist to evaluate her right ankle.  (*Id.*).

According to Wu, the ankle pain and decreased function were likely contributing to Johnson's

severe back spasms.  (*Id.*).  Wu recommended that Yosha continue to prescribe Tramadol and to

consider neuromodulation with a Gabapentin trial.  (*Id.*).  Wu declined to complete disability

paperwork without first reviewing Johnson's medical history and implementing the

recommended treatment plan.  (*Id.*).  Wu also counseled Johnson on smoking cessation.  (*Id.*).

    **B.**    <u>**Medical Opinion Evidence**</u>

       On December 22, 2010, state examiner Karl Eurenius ("Eurenius"), MD,

conducted a consultative internal medicine examination.  (Tr. 273-76).  Johnson reported that a

benign tumor had been removed from her right foot approximately seven years ago and that

since then she had experienced pain, particularly in her ankle while walking. (*Id.*). She reported that she had not been evaluated since her original surgery. (*Id.*).

Johnson reported that she had injured her back during a fall that had occurred five years ago. (*Id.*). According to Johnson, she experienced a sharp, aching pain in her low-mid back since that time. (*Id.*). Johnson reported that she is able to cook and clean five days a week with the assistance of her children. (*Id.*). She also does laundry and grocery shops once a month with assistance from her children. (*Id.*). According to Johnson, she is able to shower, bathe and dress herself. (*Id.*). She reported that she enjoys watching television, listening to the radio, reading, attending church and socializing with friends. (*Id.*).

Upon examination, Eurenius noted that Johnson appeared to be in no acute distress, had a mild limp favoring her right leg, used no assistive devices and did not need any assistance changing for the exam, rising from the chair or getting on or off the exam table. (*Id.*). According to Eurenius, Johnson could stand on her toes with some difficulty due to her right ankle and could squat only one-half of the way due to low-mid back pain. (*Id.*).

Eurenius noted that her cervical spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally. (*Id.*). Eurenius identified no scoliosis, kyphosis or abnormality in her thoracic spine. (*Id.*). Eurenius found that her lumbar flexion was limited to 45 degrees with pain in the low-mid back, which was tender to palpation. (*Id.*). Rotation was reduced in both directions to 30 degrees with pain in the low-mid back. (*Id.*). The straight leg raise was positive at 45 degrees bilaterally with pain in the low-mid back. (*Id.*). Eurenius observed that Johnson was unable to elevate her shoulders to a full 150 degrees, but found full range of motion in the shoulders, elbows, forearms and wrists. (*Id.*). He also found full range of motion in the hips, knees and ankles bilaterally. (*Id.*). According to Eurenius,

7

Johnson demonstrated full range of motion in her right foot. (*Id.*). Eurenius assessed strength in the upper and lower extremities to be five out of five. (*Id.*). Eurenius found her hand and finger dexterity to be intact and her grip strength to be five out of five bilaterally. (*Id.*).

Eurenius diagnosed Johnson with right foot pain secondary to surgery and chronic low back pain of uncertain etiology. (*Id.*). Eurenius opined that she had some limitation in prolonged standing, walking more than two city blocks, climbing or descending more than one flight of stairs, bending, lifting or carrying more than ten pounds and kneeling due to her low back pain. (*Id.*). Eurenius also opined that she was limited in walking and climbing stairs due to right foot and ankle pain. (*Id.*).

### III.     Non-Medical Evidence

In her application for benefits, Johnson indicated that she had completed high school in 1981. (Tr. 167). Johnson reported that she had previously been employed as a shelf-stocker, cashier, line server/busser and machine operator. (Tr. 167, 173, 210-16).

Johnson indicated that she lived in an apartment with her two children. (Tr. 182-91). According to Johnson, her daily activities included soaking in warm water with Epsom salts, cleaning, preparing meals and lying down. (*Id.*). She reported that she used to be able to stand for long periods of time and bend regularly, but now experiences stiffness and pain in her foot and pain in her back. (*Id.*). Johnson reported that she is able to care for her own personal hygiene and to prepare meals every other day. (*Id.*). Johnson indicated that she is able to clean, but is unable to stand for prolonged periods or bend frequently, and that her children assist her with household chores. (*Id.*).

According to Johnson, she leaves her house approximately four times a week and walks around the block with her friend in order to stretch her limbs. (*Id.*). Johnson either walks or uses public transportation and has a driver's license, but does not drive because she does not have a car. (*Id.*). Johnson reported that she is able to grocery shop once a month with assistance. (*Id.*). According to Johnson, she enjoys reading, watching television, cooking and playing board games with her children. (*Id.*). A friend visits her two or three times a week to watch television or play checkers. (*Id.*). Johnson reported that approximately three times a week she walks to church or has lunch with her friend. (*Id.*).

According to Johnson, her medical impairments make it difficult for her to lift heavy objects, stand for prolonged periods, walk, climb stairs, kneel or squat. (*Id.*). Additionally, she reported that she sometimes has difficulty rising from a seated position. (*Id.*). Johnson sometimes uses a cane or an umbrella to ambulate, but reported that she had not been prescribed an assistive device to assist her ambulation. (*Id.*). She typically uses an aid when she walks around the block or goes to church. (*Id.*). According to Johnson, she is able to walk approximately two blocks before needing to rest for approximately ten minutes. (*Id.*).

Johnson reported that she first began to experience pain affecting her activities in approximately August 2006, but did not receive treatment for it because she could not afford it. (*Id.*). According to Johnson, she experiences pain in her back and foot, which sometimes radiates to her leg. (*Id.*). She reported that she experiences pain approximately twice a week, although sometimes she experiences pain daily. (*Id.*). According to Johnson, her pain generally lasts four to five minutes, although sometimes it lasts all day. (*Id.*). She treats her pain with Aleve and Advil and also soaks in warm baths with Epsom salts. (*Id.*).

During the administrative hearing, Johnson testified that she was born on June 19, 1962. (Tr. 41). She testified that she lives with her two teenage sons. (Tr. 41-42). According to Johnson, she was previously employed as a "zoner" at a department store and that her job responsibilities included cleaning the store, straightening merchandise, stocking and unloading trucks. (Tr. 42-44). According to Johnson, she also previously worked as a packager on an assembly line. (Tr. 44-47). At the time of the hearing, she had not worked since approximately 2006. (Tr. 42).

Johnson testified that she began experiencing back pain on and off during her employment with the department store in 2005 and 2006. (Tr. 48). According to Johnson, her pain has gotten progressively worse, particularly when she bends or squats. (*Id.*). She described the pain as a "tingling" in her back, above her tailbone that sometimes feels like needles. (*Id.*). According to Johnson, the pain sometimes radiates to her legs. (Tr. 49). She explained that she had been in a motorcycle accident in the 1970's and experienced pain for a couple of weeks before it resolved. (*Id.*). According to Johnson, the pain started to come back, particularly when working or lifting things. (*Id.*).

Johnson testified that she had recently commenced treatment with Yosha, who had prescribed Tramadol for her back pain, which causes her to be fatigued. (Tr. 50-51). She testified that she sometimes uses a non-prescribed cane to ambulate due largely to her ankle pain. (Tr. 51). Johnson indicated that before she began treatment with Yosha she treated her pain with over-the-counter medications. (*Id.*).

Johnson testified that she also experiences pain in her right ankle where she previously had surgery to remove a tumor. (Tr. 52). According to Johnson, she sometimes feels like she is "walking on a ball." (Tr. 52-53). Johnson testified that her sleep is sometimes

interrupted due to pain and she frequently awakens every two hours throughout the night.
(Tr. 53).  According to Johnson, she usually goes to bed around 9:00 p.m. and gets out of bed at
approximately 10:00 a.m.  (Tr. 61-62).  Johnson testified that she typically gets a total of six
hours of sleep a night.  (*Id.*).  According to Johnson, she is frequently tired during the day and
takes one or two naps for approximately one hour each.  (Tr. 61).

Johnson estimated that she could sit and stand for approximately forty-five
minutes at a time and could walk approximately two blocks with her cane before getting a cramp
in her calves.  (Tr. 53-56).  According to Johnson, she has trouble lifting heavy objects and is
unable to bend without squatting.  (*Id.*).  Johnson testified that she enjoys reading, visiting with
her family and walking with her daughter.  (Tr. 55).

According to Johnson, she is able to grocery shop, but her children push the cart
and carry her groceries.  (Tr. 55-56).  Additionally, Johnson indicated that her daughter assists
her with laundry.  (*Id.*).  Johnson testified that she is able to care for her own personal hygiene,
although her children sometimes help her put on her shoes and get out of the bathtub.  (*Id.*).
Johnson testified that she is able to prepare meals, but is not able to stand for long while cooking.
(*Id.*).

Vocational expert, Peter Manzi ("Manzi"), also testified during the hearing.
(Tr. 64-68).  The ALJ first asked Manzi to characterize Johnson's previous employment.
(Tr. 64).  According to Manzi, Johnson previously had been employed as a sales attendant and a
hand packager.  (Tr. 64-65).  The ALJ then asked Manzi whether a person would be able to
perform Johnson's previous jobs who was the same age as Johnson, with the same education and
vocational profile, and who was able to perform the full range of light work, except they could
only occasionally stoop and climb stairs, could not climb ladders and could only walk a total of

11

one hour with no more than ten minutes of walking at a time.  (Tr. 65).  Prior to answering,

Manzi confirmed that the hypothetical included no additional standing limitation.  (Tr. 66).

Manzi testified that such an individual would be unable to perform the previously-identified jobs,

but would be able to perform other positions in the national and local economy, including

cashier II and information clerk.  (*Id.*).

The ALJ then asked Manzi to assume an individual with the same limitations,

except that they were limited to sedentary, as opposed to light, work.  (*Id.*).  Manzi testified that

such an individual could perform positions in the national and local economy, including

telephone quotation clerk and charge account clerk.  (Tr. 66-67).  The ALJ then asked Manzi to

assume an individual with the same limitations, except that the individual would need to nap for

approximately one hour during an eight-hour work shift.  (Tr. 67).  Manzi testified that such an

individual could perform positions existing in the national and local economy, including table

worker and general assembler.  (Tr. 67-68).  Finally, the ALJ asked Manzi whether jobs existed

for an individual with the same limitations, except that the individual would be off-task

approximately twenty percent of the time.  (*Id.*).  Manzi testified that such an individual could

not perform any work in the economy.  (Tr. 68).


## DISCUSSION

### I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

> To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

> (1)  whether the claimant is currently engaged in substantial gainful activity;
>
> (2)  if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)  if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)  if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)  if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.      **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 23-30).  Under step one of the process, the ALJ found that Johnson has

not engaged in substantial gainful activity since the alleged onset date.  (Tr. 25).  At step two, the

ALJ concluded that Johnson has the severe impairments of low back pain, anemia and status post

right ankle tumor surgery.  (*Id.*).  At step three, the ALJ determined that Johnson does not have

an impairment (or combination of impairments) that meets or medically equals one of the listed

impairments.  (Tr. 26).  The ALJ concluded that since the alleged onset date of August 1, 2006,

Johnson has the Residual Functional Capacity ("RFC") to perform sedentary work, except that

she can only occasionally stoop and climb stairs, is unable to climb ladders and can only walk for

a total of one hour for no more than ten minutes at a time.  (Tr. 26-28).  At steps four and five,

the ALJ determined that since August 1, 2006, Johnson was unable to perform her prior work,

but that prior to December 19, 2011, other jobs existed in the national and regional economy that

Johnson could perform, including the positions of telephone quote clerk and charge account

clerk.  (Tr. 28-29).  Accordingly, the ALJ found that Johnson was not disabled prior to December

19, 2011.  (*Id.*).  The ALJ further determined that Johnson's age category changed on December

19, 2011 and that, as of that date, considering her age, education, work experience and RFC,

there were no jobs in the national economy that Johnson could perform.  (Tr. 30).  Accordingly,

the ALJ found that Johnson became disabled on December 19, 2011.  (*Id.*).

B.      **Johnson's Contentions**

Johnson challenges the ALJ's determination on three grounds.  First, she argues

that the ALJ committed legal error in determining the disability onset day.  (Docket # 10-1 at

11-16).  Next, she maintains that the ALJ's conclusion that Johnson could only walk for a total

of one hour is inconsistent with the ALJ's conclusion that Johnson could perform the requirements of sedentary work.  (*Id.* at 16-19).  Finally, Johnson contends that the ALJ's opinion is not based upon substantial evidence because it relied upon a vague opinion provided by Eurenius.  (*Id.* at 19-20).

## II.   Analysis

### A.   Disability Onset Date

Johnson argues that the ALJ arbitrarily determined that her disability onset date was December 19, 2011.  (*Id.* at 11-16).  She contends that the ALJ committed legal error because he failed to follow Social Security Ruling 83-20, which provides guidance concerning how to determine the onset date of disabilities.  (*Id.*).  According to Johnson, because her case involves a disability without a sudden or traumatic origin, the ALJ should have considered her allegations concerning the timing of the onset, her work history, and the medical evidence concerning the impairment's severity.  (*Id.* (citing SSR 83-20, 1983 WL 31249 (1983) and *Martinez v. Barnhart*, 262 F. Supp. 2d 40, 45 (W.D.N.Y. 2003)).  The government maintains that the ALJ in fact conducted the proper analysis in determining that Johnson's onset date was December 19, 2011.  (Docket # 12 at 12-15).

Contrary to Johnson's contention, the ALJ did not arbitrarily determine her disability onset date; rather, he determined that her age category changed six months prior to her fiftieth birthday (December 19, 2011) and that, by virtue of her age category change, she became disabled on that date under the Medical-Vocational Guidelines (the "Grids").

The Grids divide claimants into specific categories according to their age, transferability of skills and RFC.  *See* 20 C.F.R. Part 404, Subpt. P, App. 2.  The regulations

16

provide for three distinct age categories: (1) "younger person" is an individual between the ages 18 and 49; (2) "person closely approaching advanced age" is an individual between the ages 50 and 54; and, (3) "person of advanced age" is an individual 55 and over. 20 C.F.R. §§ 404.1563(c)–(e); 416.963(c)-(e). The Grids recognize that individuals who are closely approaching advanced age "may be significantly limited in vocational adaptability if they are restricted to sedentary work." 20 C.F.R. Part 404, Subpt. P, App. 2 at § 201.00(g). Thus, the Grids generally direct a finding of disability when a person is over fifty years old, can only perform sedentary work, has no transferable skills and either has no past work experience or can no longer perform vocationally relevant past work. *Id.*

The regulations direct that the age category that applies to a claimant during the period for which they claim disability should be used to determine whether or not the claimant is disabled. 20 C.F.R. §§ 404.1563(b); 416.963(b). The regulations make clear, however, that the age categories are not to be applied "mechanically in a borderline situation." *Id.* Thus, if a claimant is within a few days or months of obtaining an older age category, "and using the older age category would result in a determination or decision that [the claimant] [is] disabled, [the ALJ] [should] consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case." *Id.* Although the "regulations do not clearly define the outer limits of a borderline situation," several courts have held that a period of up to six months is within the rule, *see Souliere v. Colvin*, 2015 WL 93827, *5 (D. Vt. 2015) (collecting cases); *Metaxotos v. Barnhart*, 2005 WL 2899851, *8 (S.D.N.Y. 2005) ("[s]ome courts which have addressed this regulation have held that six months is within the rule") (collecting cases). *But see Smolinski v. Astrue*, 2008 WL 4287819, *4 (W.D.N.Y. 2008) ("[a]mong the district courts in the Second Circuit, three months appears to delineate the outer limits of a few months")

(internal quotation omitted), and several courts have held that a period of more than six months

is not, *see Gravel v. Barnhart*, 360 F. Supp. 2d 442, 446 n.8 (N.D.N.Y. 2005) (collecting cases);

*Hunt v. Comm'r of Soc. Sec.*, 2004 WL 1557333, *5 n.14 (N.D.N.Y. 2004) (eight months not

borderline).

        In this case, the ALJ recognized that it was "unclear from the record exactly when

the claimant began experiencing low back pain" and conducted the required sequential analysis

using Johnson's alleged onset date (August 1, 2006) to determine whether she suffered from any

severe impairments and whether those impairments met any of the listings, to formulate her

RFC, and to determine whether she could perform her past relevant work.  (Tr. 25-28).

Specifically, the ALJ concluded that as of August 1, 2006, Johnson suffered from severe

impairments that did not meet the listings, but nevertheless limited her RFC to a degree

preventing her from performing her past work.  (*Id.*).

        The ALJ determined that Johnson's medical condition "became disabling on

December 19, 2011 . . . six months before [Johnson's] [fiftieth] birthday, but not prior to."

(Tr. 28).  In reaching this determination, the ALJ specifically stated that prior to that time,

Johnson was "a younger individual," but that on "December 19, 2011, the claimant's age

category changed to an individual closely approaching advanced age."  (*Id.* (citing 20 C.F.R.

§§ 404.1563, 416.963)).  In other words, the ALJ determined that Johnson was not disabled prior

to December 19, 2011 because she retained the RFC to perform jobs that existed in the national

and regional economy – a determination that is supported by substantial evidence as discussed

*infra*.  (Tr. 29-30).  The ALJ further concluded that, beginning on December 19, 2011, six

months prior to her fiftieth birthday, Johnson became disabled because that was "the date the

18

claimant's age category changed" and, by application of the Grids, a finding of disability was

warranted.  (*Id.* (citing Medical-Vocational Rule 201.14)).

　　　　　The ALJ could have more clearly explained that he was refraining from a

"mechanical" application of the age categories in order to consider whether Johnson should be

determined to fall within the new age category as of six months before her fiftieth birthday.  Yet,

a careful review of the ALJ's decision leaves no doubt that this is precisely what he did.

Accordingly, I conclude that the ALJ's determination that Johnson became disabled on

December 19, 2011 does not warrant remand.

　　　**B.**　　　**RFC Assessment**

　　　　　An individual's RFC is her "maximum remaining ability to do sustained work

activities in an ordinary work setting on a regular and continuing basis."  *Melville v. Apfel,* 198

F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)).  When making an

RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities,

symptomology, including pain and other limitations which could interfere with work activities

on a regular and continuing basis."  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009)

(citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant

evidence, including medical opinions and facts, physical and mental abilities, non-severe

impairments, and [p]laintiff's subjective evidence of symptoms."  *Stanton v. Astrue*, 2009 WL

1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d

Cir. 2010).

　　　　　I turn first to Johnson's contention that the ALJ's determination that she could

perform sedentary work is inconsistent with his determination that she was unable to walk for

more than one hour during a workday.  Johnson maintains that the walking limitation is

inconsistent with sedentary work, which requires an individual to be able stand or walk up to two hours during a workday, and that the hypothetical posed to the vocational expert was thus based upon a flawed RFC.  Johnson is correct about the requirements of sedentary work.  *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) ("[s]edentary work also generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day") (citing SSR 83-10, 1983 WL 31251 (1983) and 20 C.F.R. § 404.1567(a)).  Yet, as the government correctly notes, the ALJ's hypothetical to the vocational expert explicitly contained the one-hour walking limitation.  (Docket # 12 at 16 (citing Tr. 65-66)).

The ALJ's decision and the transcript from the administrative proceeding demonstrate that the RFC contains no inconsistency and that the hypothetical posed to the vocational expert incorporated all of the limitations identified by the ALJ in his RFC assessment.  During the hearing, the ALJ asked the vocational expert to assume a hypothetical individual who was capable of performing light work "with the following additional limitations: she can . . . walk a total of one hour, and no more than ten minutes at one time walking."  (Tr. 65).  The vocational expert then clarified that the hypothetical included only a one-hour walking, and not standing, limitation.  (Tr. 65-66).  After the clarification, the vocational expert identified jobs at the light exertional level that could be performed by an individual with those limitations.  (Tr. 66).

The ALJ subsequently asked the vocational expert to assume the same limitations, except that instead of light work, the individual would have the capacity only for sedentary work.  (Tr. 66-67).  Again, the vocational expert identified positions that could be performed at a sedentary exertional level, with the additional limitations identified by the ALJ.  Accordingly, because the hypothetical posed to the vocational expert explicitly contained a one-hour walking

limitation, no inconsistency exists between the hypothetical posed to the vocational expert and the RFC assessed by the ALJ.

Johnson further challenges the ALJ's hypothetical on the grounds that it did not account for the standing limitations assessed by Eurenius. Eurenius opined that Johnson would have some limitation for "prolonged standing" and for "walking more than two city blocks." (Tr. 276). Johnson testified that she was able to stand longer than she could walk. (Tr. 54-55). Consistent with Eurenius's opinion and Johnson's testimony, the ALJ asked the vocational expert to assume an individual who could perform sedentary work (which would limit the individual to walking and standing no more than two hours per workday) and to assume a further limitation that the individual's ability to walk was limited to no more than one hour total during the workday (and no more than ten minutes at a time), but to stand was not otherwise limited. (Tr. 65-66). Accordingly, the hypothetical to the vocational expert incorporated a two-hour standing limitation, which was consistent with the prolonged standing limitation assessed by Eurenius. *See Carroll v. Colvin*, 2014 WL 2945797, *4 (W.D.N.Y. 2014) ("several courts have upheld an ALJ's decision that the claimant could perform light or sedentary work even when there is evidence that the claimant had moderate difficulties in prolonged sitting or standing").

I likewise reject Johnson's remaining challenges to the ALJ's RFC assessment. I disagree with Johnson that Eurenius's opinion assessing some limitation for bending is inconsistent with a determination that Johnson can perform the requirements of sedentary work.[3] *See Nelson v. Colvin*, 2014 WL 1342964, *12 (E.D.N.Y. 2014) ("the ALJ's determination that

---

[3]   Johnson correctly notes that sedentary work requires only occasional "stooping." *See* SSR 96-9p, 1996 WL 374185, *8 (1996). Stooping means to "bend[] the body downward and forward by bending the spine at the waist." *See* SSR 83-14, 1983 WL 31254, *2 (1983). According to the guidance, a "restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work." *See* SSR 96-9p, 1996 WL 374185 at *8. In any event, the ALJ's RFC explicitly limited Johnson to only occasionally stooping. (Tr. 26).

[p]laintiff could perform 'light work' is supported by [the doctor's] assessment of a 'mild to moderate limitation for . . . bending'").  I further reject her challenge that Eurenius's opinion is impermissibly vague.  Although an expert opinion may describe a claimant's impairments in terms that are so vague as to render the opinion useless, *see Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013), the use of vague phrases by a consultative examiner does not automatically render an opinion impermissibly vague.  *See Rosenbauer v. Astrue*, 2014 WL 4187210, *16 (W.D.N.Y. 2014) (collecting cases).  In this case, Eurenius provided an assessment after conducting a thorough examination of Johnson.  During the examination, Eurenius noted that Johnson did not appear to be in acute distress, was able to stand on her toes with difficulty, squat halfway, had a normal stance and a mild limp, had full flexion, extension, lateral flexion and full rotary movement in her cervical spine and had some flexion and range of motion limitations in her lumbar spine.  (Tr. 274-75).  Accordingly, Eurenius's opinion that Johnson would have some limitations "was based upon medical examination, evaluation and observation, and the ALJ thus properly relied upon Eurenius's opinion to support [his] RFC assessment."  *See Rosenbauer v. Astrue*, 2014 WL 4187210 at *17 (collecting cases).  Accordingly, I conclude that the ALJ's physical RFC determination is supported by substantial evidence.

## CONCLUSION

This Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the

pleadings (**Docket # 13**) is **GRANTED**.  Johnson's motion for judgment on the pleadings

(**Docket # 10**) is **DENIED**, and Johnson's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


                                        _____*s/Marian W. Payson*_____
                                              MARIAN W. PAYSON
                                        United States Magistrate Judge


Dated: Rochester, New York
       March 24, 2015